**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

| | |
|---|---|
| Pyramid Diversified Services, Inc. d/b/a )<br>Simple HR, )<br> )<br>　　　　　Plaintiffs, )<br> )<br>　　　　　vs. )<br> )<br>Providence Property & Casualty )<br>Insurance Company, and PACA, Inc., )<br> )<br>　　　　　Defendants. ) | Case No.: |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Pyramid Diversified Services, Inc. d/b/a Simple HR, complain of Defendants

Providence Property & Casualty Insurance Company and PACA Incorporated, and state:

**PARTIES**

1.　　**Simple HR**.  Plaintiff Pyramid Diversified Service, Inc., doing business as

Simple HR ("SHR") is a Florida corporation with its principal place of business in Destin,

Florida.  Simple HR is a citizen of Florida.

2.　　**PPC**.  Defendant Providence Property & Casualty Insurance Company

("PPC") is an Oklahoma corporation and Oklahoma licensed insurance company. PPC

maintains what it describes as its "Home" office in Oklahoma. PPC has and continues to do

substantial insurance business in the state of Florida and is subject to the authority of the

Florida Insurance Commissioner. PPC has substantial contacts with the State and this District.

3.　　**PACA.**  Defendant PACA, Inc. ("PACA") is a corporation domiciled in

Alabama with its principal offices located in Alexander City, Alabama. PACA is a citizen of

Alabama. PACA is a "professional employer organization" ("PEO") and has substantial and material contacts with the state of Florida and this District.

## JURISDICTION AND VENUE

4.      **Jurisdiction**.  The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. There is complete diversity of citizenship between plaintiff and the defendants.

5.      **Venue**. Venue is proper in this district and division under 28 U.S.C. § 1391, as a substantial part of the events, agreements, transfers, coverage, and actions giving rise to the instant action occurred in this District.

6.      **Facts Common To and Incorporated in All Counts:**  SHR is a PEO and provides employee-related services to various businesses in several states. Among the services that SHR offers is providing employees mandatory workers' compensation coverage ("WCC") through a licensed insurance carrier.

7.      SHR originally provided WCC to its clients through a conduit organization or program managed by PACA or its affiliates which acted in many forms as the direct agent of PPC. By way of the arrangement between PACA and PPC, a third party PEO could obtain primary insurance coverage from PPC without directly contracting with the carrier. Given that PACA is not an authorized insurance carrier, upon information and belief, it would solicit potential accounts and collect premium on behalf of PPC. SHR received WCC via the PACA conduit from 2003 through the end of 2004.

8.      Although investigation has revealed some information as to workings and machinations, SHR has never been made privy to the agreement(s) governing the relationship

between Defendants. At all times material PACA appeared to act as a secondary market agent by and on behalf of PPC although such has been expressly disclaimed by PPC.

9.      **Loans To PACA:**  On or about January 3, 2003, PACA solicited SHR for a loan of monies and presented a written agreement entitled "Surplus Loan Agreement" ("SLA"). A true and correct copy of the SLA is attached hereto and made a part hereof as Exhibit A.

10.      Pursuant to the SLA, PACA is designated as the "BORROWER" and SHR as the "LENDER." SHR was required by the express terms of the SLA to loan the sum of $823,903.20 to PACA within "three (3) business days after execution of this Agreement." SHR refused to provide such a sum within three business days. Instead, SHR loaned PACA a total of $823,903.20 in serial installments over approximately an eighteen month period.

11.      The SLA enumerates a series of described uses to which the loan proceeds are to be dedicated yet Plaintiff has been unable to confirm any such use. The subject loan uses were designed to benefit PACA (Borrower) or an insurance carrier with whom it was affiliated.

12.      The SLA provides that PACA shall repay SHR monies borrowed pursuant to the Agreement (referencing the loan of $823,903.20) "over eighteen (18) months or according to Article Three below and pursuant to any Addendums below and to the terms of a surplus note made by PPC or another carrier. . . ."

13.      Article Three provides that PACA shall repay SHR when PACA receives principal and interest "on the aforementioned surplus note issued . . . to BORROWER [PACA]."

14.     The first repayment covenant is succinct, comprehensible, specific, and self-executing (repayment over eighteen (18) months). Eighteen months have transpired since SHR provided its final loan installment and PACA has failed to repay the first dollar of such loans.

15.     The second repayment covenant is pure fiction. Upon investigation as to repayment of the loan, PACA acknowledged that prior to expiration of the eighteen month repayment provision neither PPC nor any other "carrier" has ever issued any "surplus note." Further, PACA confirmed that neither PPC nor any other carrier has ever, at anytime, issued any "surplus note" in favor of or even applying to PACA. Simply stated, the investigated facts disclose that no such "surplus note" exists, ever existed, or has ever even been contemplated. In sum, this secondary repayment covenant is nonsense and SHR believes that under no circumstances has PPC ever issued or would contemplate issuing an actual "surplus note" to an insured PEO.

16.     PACA knew that SHR would never consent to directly loan an insurance company about which it knew nothing such a sum without explicit terms for repayment and a bond or third party CDS securing repayment. Accordingly, PACA included the specific eighteen month repayment covenant placed first in text of the SLA.

17.     The "surplus note" provisions of the SLA are bizarre and incongruent. Accordingly, SHR insisted that the SLA contain a concrete and specific provision which required a time-specific repayment without the speculation, conjecture, and obfuscation relating to some mysterious "surplus note." SHR was concerned that repayment contingent on the nebulous "surplus note" provision was not a bona-fide loan arrangement and would

quickly be re-characterized by a certified public accountant as a gift or a governmental examiner as something worse.[1]

18.     Unknown to SHR at the time, the SLA incorporated language verbatim that PPC employed to extract "surplus" loans from other insureds. Notably though, these PPC loan agreements do not contain a specific repayment covenant which establishes a time certain for loan repayment as discussed *supra*. *See* Surplus Loan Agreement relating to Peoplease Corporation attached hereto and made part hereof by reference as Exhibit B.

19.     PACA has subsequently acknowledged these loans and provided internal accounting documentation confirming its receipt of such loans by date and amount.

20.     The SLA contains a permissive venue provision in that the parties to the SLA consent to personal jurisdiction of Alabama courts and acknowledge the "propriety" or legality of venue in such courts. This is but another way of saying that the parties waive any objection to personal jurisdiction and venue in Alabama. The provision patently lacks any element of exclusivity and by its plain language does not preclude another court of competent jurisdiction from exercising jurisdiction over the parties. This provision is of the standard genre a creditor would insert in a loan agreement to allow an enforcement action in its home state regardless of the domicile of the debtor.

21.     **SHR Contracts Directly With PPC:**  After SHR noticed the termination of participation in the PACA insurance conduit effective December 31, 2004, PPC offered to provide direct workers' compensation insurance. Accordingly, by separate annual insurance contracts PPC acted as the workers' compensation carrier for SHR from January 1, 2005, through December 31, 2007.

_____
[1] Such an occurrence has implications far beyond the mere imposition of tax and penalties such as intentional conspiracy to avoid the tax laws of the United States.

22.     Each such contract was proposed to SHR in Florida, consented to (as described) by SHR in Florida, and covered Florida domiciled employees. Each such insurance contract purports to be governed by the laws of the state of Oklahoma. Notably, SHR has never done business in the state of Oklahoma where PPC is domiciled or in the state of Texas where PPC maintains one of its several offices.

23.     The material annual written insurance contracts between PPC and SHR referenced above are attached hereto and made a part hereof as respective Exhibit C (2005), Exhibit D (2006) and Exhibit E (2007).

24.     The Policies provided for an express per claim "deductible" of $250,000 in 2005; $500,000 in 2006; and $500,000 in 2007. PPC covenants to provide coverage on every claim for payments in excess of the designated deductible up to $1,000,000 by PPC. This is *raison d'etre* for the purchase of the workers' compensation coverage for each policy period.

25.     **The Claims Collateral Account:**  The Policies required the deposit of a "Claims Collateral" account with PPC. The sum of $628,502.26 was placed on deposit with PPC during the year 2005 as the Claims Collateral Account of SHR. Notably, this sum not only satisfied, but substantially exceeded the maximum Collateral Claims Account of $250,000 PPC called for in the 2005 Policy.

26.     The fact that PPC holds such an account belonging to SHR is beyond debate. In the second year of this insurance relationship, PPC expressly acknowledged on December 14, 2005, that it held the sum of $628,502.26 as SHR's Claims Collateral Account "We [PPC] currently hold $628,205 in Claims Collateral." *See* Exhibit D at 4 of 13.

27.     PPC's "Proposal" dated December 4, 2006, indicated that the Claims Collateral Account anticipated for SHR may be as much as $700,000. However, that

statement is followed by this proviso: "We will not request any additional Claims Collateral at this time." *See* Exhibit F attached hereto and made a part hereof by reference at 3 of 14.

28.     Further, during the period when coverage was active and SHR was required to pay a manual premium PPC never suggested or implied that it had any basis to demand upward adjustment of such Account or that such was not in conformance with the insurance contract as actually administered by PPC.

29.     **Uncertainty and Bad Faith Refusals:**  In late 2007, SHR timely notified PPC that it had obtained alternative insurance coverage for the calendar year 2008 from another carrier. PPC made several attempts to convince SHR to remain as an insured, however, too many instances of questionable claims handling and business practices had come to SHR's attention during the coverage period.

30.     Inasmuch as the claims made under the Policies are significantly winding down, SHR requested that PPC disclose how it intended to apply SHR's Claims Collateral Account to the remaining open claims. Notwithstanding its express representations over the years, PPC now denies that SHR ever had a Claims Collateral Account and based on that allegation has refused to discuss how the $628,205,000 Account will be applied.

31.     **The PACA Loans:**  Further, SHR began to make inquiries of PACA regarding when its loans would be repaid inasmuch as eighteen months had passed since the last loan installment was provided by SHR in August of 2004. PACA represented that the loan proceeds from SHR had been provided to PPC for use implying that PPC was responsible for loan repayment.

32.     Notwithstanding that PACA was responsible for repayment of the loan, SHR made inquiry of PPC and was informed that PPC disclaims any knowledge of a loan between

SHR and PACA and flatly stated that no such designated loan amounts were ever forwarded to PPC or its affiliates.

33.     Further, PPC acknowledged that it never offered or issued any loan papers, notes or offers of any kind or type to SHR with respect to a loan to PACA.

34.     **The Scheme Underlying Surplus Loans:**  SHR is intensely concerned with respect to the repayment of its loans to PACA and the possible receipt of such monies by PPC. SHR's pre-suit investigation has not revealed a single instance where a direct or indirect insured "lender" has been repaid or credited monies borrowed under the auspices of some alleged "surplus note" with respect to PPC, its affiliates and agents. On occasion, SHR has discovered that such surplus loans can involve incredibly large amounts of money.

35.     It appears that PPC, and PACA while acting on behalf of PPC, routinely demanded very substantial "surplus loans" from prospective insureds. Various reasons to substantiate the need for such loans are represented with regulatory "surplus" requirements being chief among them.

36.     Upon information and belief, these alleged circumstances are never documented or confirmed to the insured lender. Moreover, it appears that neither PPC nor any other person involved or related to these "loans" ever issues an actual "surplus note" in favor of the original lender. Instead, such "loans" are funneled through Providence Holdings, Inc. ("PHI") which is PPC's parent company. PHI never issues a surplus note because it is not required to hold any "surplus."

37.     PHI then gives the money lent to PPC who issues some form of a debenture or other legal instrument in favor of PHI. The Surplus Debenture prepared by PPC stipulates that

it cannot repay any "loans" to PHI unless its "surplus" constitutes some monstrous amount which PHI and PPC know will never be achieved.

38.     After PHI and PPC collectively select the "surplus" necessary to guarantee no such loan is ever subject to repayment, PPC petitions the Oklahoma Insurance Commissioner for "approval" of the conditions set forth in the Surplus Debenture. State approval is readily forthcoming because the surplus level designated in the Surplus Debenture is at such an absurd level based on reality that "repayment" poses no conceivable risk of insolvency or receivership to state regulators.

39.     After a short, but an appropriately convincing period of time to legitimatize the illusion of a "loan," the Surplus Debentures are cancelled and converted to "paid-in" capital. PHI then receives additional and effectively worthless "preferred stock" from its subsidiary PPC and the transaction is over.

40.     Upon information and belief, a legitimate surplus note is never issued or provided to the original lender or PHI. Further, it appears that the insured Lender is never notified of the issuance or terms of the Surplus Debenture and its subsequent cancellation.

41.     Upon information and belief, this is an inveterate business practice of PPC and its agents. The "Borrower" who solicits these "surplus" loans knows with absolute certainty there is no original intention or likelihood of repayment. These "surplus loans" invariably end up in the corporate coffers tax-free as paid-in capital. In reality, these "loans" operate as nothing more than misrepresented, undisclosed, unauthorized and poorly disguised premium income or excess loss charges which violate the stipulated premium and deductible set forth in PPC's Policies.

42.     **Busting The Policy Deductible:**  As noted, a PPC Policy openly provides for a per claim deductible with attendant coverage by PPC thereafter generally up to $1,000,000. PPC openly represents that its policies provide for a designated deductible paid by the insured with the remainder of any claim coverage provided by PPC.

43.     Upon information and belief, PPC engages in a routine business practice which serves to stack an insured's per claim liability beyond the agreed "per claim" deductible. This can result in an insured paying more per claim than the clearly stated "deductible" represented by PPC.

44.     SHR's investigation revealed that PPC's Policies are written in a number of different of ways and lack a common consistency. In 2005, PPC's proposal (Policy) represented that SHR would be invoiced for "incurred claims." The phrase "incurred claims" is not defined, but the commonly understood meaning of "incurred" is something which has actually been experienced or in the context of insurance, something "paid."

45.     The 2005 Policy makes no reference to invoicing the costs (losses) associated with claims adjusting and defense and no reference to any cash collateral accounts.

46.     The 2005 Policy references the phrase "developed claims," but fails to explicate in any way what such term implies by its use.

47.     Finally, the 2005 Policy specifically refers to "Claims Collateral" and sets that account at $250,000. The phrase is not defined, however, it is clear that any obligation SHR had with respect to Claims Collateral was satisfied by receipt of $628,205,000 as acknowledged in its Proposal of December 14, 2005.

48.     In 2006, PPC's Policy underwent certain specific changes. In all material aspects, the 2007 Policy mirrors the 2006 Policy.

49.     Although abundantly utilized in these Policies, the term "loss" is not separately defined anywhere in the 2006 Policy and any uncertainty or ambiguity with respect to that term must be resolved against PPC.[2]

50.     The Policies state that SHR is responsible for paying "your [SHR's] Incurred Loss Deductible Liabilities." The Policies provide that <u>Incurred Loss Deductible Liabilities</u> include "Reported Losses subject to the deductible amount . . . whether paid or unpaid, <u>and Allocated Loss Adjusting Expenses</u> . . ." (Emphasis added.)

51.     "<u>Reported Losses</u>" are defined as "all losses for which the Underwriter has been formally notified by the Client, and which have been recorded in the Underwriter's claims administration system." (Emphasis added.)

52.     The phrase "<u>Incurred Losses</u>" means "the sum of all paid and unpaid losses, <u>including Allocated Loss Adjusted Expenses,</u> for Reported Losses occurring during the term of coverage. Incurred Losses are subject to the Deductible amount for each and every loss."

53.     It is important to note that the rejected 2008 PPC Proposal defined "Incurred Losses" as the sum of all payments made by Us <u>plus the reserves</u> established by Us on all Reported Losses." (Emphasis added.) This implies a very significant concept applicable to the 2006-2007 Policies and that is that the phrase "Incurred Losses" does not include and is something substantially less than paid losses and calculated reserves. This self-evident construction of the term by comparison also acts to limit the scope of every other contractual phrase discussed which incorporates "Incurred Losses" within its definition.  *See*, the 2008 PPC Proposal attached hereto as Exhibit F.

---

[2] PPC could have easily defined the term "incurred" as well as the term "loss." A "loss" is generally deemed to be some cost or expense which has been actually paid or is so set and certain that its payment is inevitable. However, since PPC apparently assumed it was to its ultimate benefit to leave these distinctions undefined and undisclosed to its insureds it should not benefit from its folly.

54.     The phrase "Incurred Loss Deductible Liabilities" means "the amount of all Incurred Losses." (Emphasis added.)

55.     The phrase "Allocated Adjusted Loss Expenses" is included within the meaning and definition of "Incurred Losses" (subject to the deductible amount); as "Incurred Loss Deductible Liabilities" which incorporates and includes the definition of "Incurred Losses" making such expenses subject to the deductible; and, as "Developed Losses" which, subject to the deductible amount, include "Reported Losses," "Incurred But Not Reported Losses," and "Allocated Loss Adjusting Expenses."[3]

56.     The Policies further declare that SHR is responsible for "Developed Losses in excess of your Incurred Loss Deductible Liabilities."  As noted, "Developed Losses" are subject to the deductible set forth in the policy and includes "Reported Losses," "Incurred But Not Reported Losses," and "Allocated Loss Adjusting Expenses." It is inconceivable how Developed Losses could ever exceed the "Incurred Loss Deductible Liabilities" since each element of a "Developed Loss" is governed and restricted by the limitations imposed by the insured's deductible.

57.     Upon information and belief, SHR believes that PPC employs billing practices which do not subject "Allocated Loss Adjusting Expenses" to the agreed deductible. Further, SHR believes that PPC may subject "Developed Losses" to some form of an unauthorized multiplier which acts to exponentially inflate the cost of the agreed deductible in violation of the Policies and without notice to the insured.

58.     SHR's investigation has revealed instances where an insured was subjected to an invoice based on the actual and anticipated cost of aggregated claims to PPC, minus claim amounts actually reimbursed by the insured (multiplicand), and multiplied by a multiplier

---

[3] This phrase is repeatedly and uniformly defined as a categorical "loss" within the 2006 Policy.

substantially in excess of one (1.8). This resulted in a product and an assessment which would, by definition, substantially exceed the limitation of the agreed deductible applicable to each claim and amount to claim stacking.

59.     SHR cannot determine based on its invoices whether or not PPC has attempted to exceed the agreed deductible. However, stacking adjusting expenses as losses without regard to the deductible and calculating a loss by use of a multiplier results in overcharges which PPC would be liable for by contract.

60.     **Claims Adjudication:**  At least as to a portion of the policy year 2005, PPC employed a third party administrator to adjust claims made under its respective policies. Upon information and belief, this third party administrator was dismissed for poor performance and PPC directly handled the administration of claims.

61.     As noted, PPC is still handling a small number of what are generally referred to as "winding-down" or "run-off" claims relative to SHR's coverage periods. Upon review, SHR submits that the fees and expenses for such management charged by PPC (or a designee unknown to SHR) are excessive and unjustified. PPC has a policy of not permitting its insureds to review its adjusting files or to otherwise seek to evaluate the reasonableness of the adjusting costs charged for claim management.

62.     Such policy and occurrence comports and is consistent with the manner in which PPC seeks to uniformly extract every available dollar from its clients while avoiding any possibility of having to actually provide coverage.

63.     For months, SHR has sought accurate information from Defendants and some informal mutual resolution to the material issues which underpin this controversy. At this

juncture, not only has SHR been rebuffed, if not hoodwinked, but it seems manifestly certain that the Defendants, singularly or collectively, intend to retain SHR's monies in perpetuity.

64.     Additionally, because of SHR's decision to seek other coverage and its persistence in demanding that its property be lawfully acknowledged, accounted for, and repaid or credited, Plaintiff is certain that PPC intends to extract retribution. PPC accomplished the first leg of its vendetta by declaring SHR's Claims Collateral Account non-existent. There is little doubt that PPC will now claim alleged rights and attempt assessments which do not exist or which were long ago waived and abandoned.

65.     SHR has no other remedy at this juncture except to bring this action. SHR and the Defendants are in the midst of a real and substantial case and controversy which can only be resolved and adjudicated by this Court.

66.     SHR is in substantial doubt as to its rights under the relationships described herein and gravely concerned about the present accounting of its assets in control of Defendants and the ultimate and permanent loss of the same.

67.     All conditions precedent to bringing this action are or will shortly be satisfied.

68.     **<u>Notice of PPC And Others Filing Suit:</u>**  Pursuant to investigation, SHR has confirmed that PPC and its affiliates many weeks ago filed an action in the Eastern District of Texas naming SHR and multiple others entities as Defendants. *See* United States District Court, Eastern District of Texas, Case No.4:08cv298. Although PPC is fully aware of the identity of SHR's registered agent as indicated in its Complaint, it has never attempted to serve SHR. It manifestly appears that notwithstanding the filing of such action, PPC has no intention of pursuing the same and will allow this controversy to remain static and unresolved.

69.     SHR believes that PPC has not pursued service because it knows with complete certitude that SHR has never done business in and has no jurisdictional contacts with the state of Texas. Accordingly, given the urgency of the instant circumstances and probable loss of property and property rights to SHR, this action is timely and appropriate as PPC and PACA have substantial and undeniable contacts with Florida and will be promptly served via their designated resident agents.

70.     **Pleading In The Alternative:**  SHR advises the Court that in accordance with the adjective law governing civil actions certain of its counts are stated in the alternative.

71.     **Demand For Jury Trial:** SHR requests a trial by jury on all matters triable by law as such. This specifically includes any material facts in dispute which relate to SHR's cause of action seeking Declaratory Judgment.

## COUNT I: BREACH OF CONTRACT

72.     All allegations above have been incorporated by reference in this Count I and all subsequent counts alleged herein.

73.     PPC has breached its 2005, 2006, and 2007 Policies with SHR by denying the existence of SHR's Claims Collateral Account which was admitted as satisfied in all material coverage periods.

74.     PPC has breached its Policies by refusing, under the attendant circumstances to acknowledge, as well as inform SHR as to how it intends to apply or refund SHR's Claims Collateral Account.

75.     PPC has breached its Policies by assessing SHR, by the ways and means described above, for monies above the deductible amounts agreed to and guaranteed in each respective Policy Year.

76.     PPC has breached its Policies by charging claims administration fees in excess of what is necessary and reasonable and by employing a policy of non-disclosure of its methodologies and processes in such claims administration.

77.     PPC has breached its Policies by excluding certain costs subject to the Deductible amount from the calculation of such amount and invoicing itemized costs thereon.

78.     SHR has been damaged as a result of such breaches and demands judgment against PPC.

WHEREFORE, Plaintiff demands judgment against PPC for all damages allowed by law together with prejudgment interest, attorney's fees and any further relief which this Court may deem just and appropriate.  The Plaintiff demands a trial by jury of all issues triable as of right by jury.

## COUNT II: VIOLATION OF COVENANT OF GOOD FAITH

79.     Additional numbered paragraphs 70-78 are incorporated by reference as if fully stated herein.

80.     In light of the allegations of fact and breaches alleged above. PPC has not only committed express breaches of its Policies, but has used its position, power, and claimed discretion to violate the covenant of good faith and fair dealing which underlies its Policies and obligations to SHR.

81.     SHR has been damaged as a result of such breach and demands judgment against PPC.

WHEREFORE, Plaintiff demands judgment against PPC for all damages allowed by law together with prejudgment interest, attorney's fees and any further relief which this Court

may deem just and appropriate.  The Plaintiff demands a trial by jury of all issues triable as of right by jury.

## COUNT III: CONVERSION

82.     PPC has repeatedly acknowledged to SHR that it is in possession of a substantial sum of specifically identified money held for all intents and purposes in constructive trust for the benefit of SHR.

83.     Such funds may not be used or applied except in specific circumstances and are subject to either being credited or returned intact if not subject to some authorized use.

84.     After SHR informed PPC that it intended to terminate its insurance relationship, PPC claimed that no such Account in favor of SHR existed.

85.     PPC has and continues to maintain unauthorized and improper control and dominion over the specific Account of SHR as described.

86.     PPC's action constitutes a conscious and deliberate conversion by deceit and misrepresentation of monies belonging to and in benefit of SHR.

87.     SHR has been damaged as a result of such breach and demands judgment against PPC.

WHEREFORE, Plaintiff demands judgment against PPC for all damages allowed by law together with prejudgment interest, attorney's fees and any further relief which this Court may deem just and appropriate.  The Plaintiff demands a trial by jury of all issues triable as of right by jury.

## COUNT IV: FRAUD IN THE INDUCEMENT

88.     A paramount reason that SHR agreed to enter into the Policies with PPC at issue herein was because of PPC's express acknowledgement that it held and was in

undeniable receipt of a substantial sum of money credited to SHR and correspondingly satisfied any Claims Collateral Account obligation SHR may have under such Policies.

89.     PPC has disclaimed the possession of any such Account in favor of SHR.

90.     PPC knew at all times material hereto that its express representations to SHR were material to SHR and false.

91.     PPC knew and intended SHR to absolutely and justifiably rely on such representations in making its decision to contract with PPC for workers' compensation insurance.

92.     But for such misrepresentations SHR would have sought a contractual relationship with another and more credible insurer.

93.     SHR seeks the recission of such Policies or in the alternative seeks substantial damages suffered as a result of PPC's conduct and demands judgment thereon.

WHEREFORE, Plaintiff demands judgment against PPC for all damages allowed by law together with prejudgment interest, attorney's fees and any further relief which this Court may deem just and appropriate.  The Plaintiff demands a trial by jury of all issues triable as of right by jury.

### COUNT V: COMMON LAW FRAUD

94.     Additional numbered paragraphs 87-93 are incorporated by reference as if fully stated herein.

95.      PPC directly or through its agents engages in an inveterate and systematic course of conduct to obtain monies under the pretense of a "loan" which it or its agents never intend to repay.

96.     On numerous occasions, PPC has obtained the direct benefits of monies extracted from its insureds under the guise of a loan to assist and benefit the surplus requirements which PPC is allegedly subject to by regulation. SHR relied on such false statements of intention to repay and need for such sums.

97.     When such loans are solicited there is no intention on the part of PPC or its agent to ever repay such loans. Instead, through a series of common and systematic machinations, such "loans" are first rendered by artificial condition as impossible for repayment. Subsequent to that action, the substance of the loans are converted to paid-in capital all without ever informing the original lender that such conversion was originally intended and inevitable.

98.     The subject loans act as a device to collect what amounts to nothing more than unauthorized and undisclosed income without imposition of federal or state tax as the case may be. This course of conduct is not an isolated or occasional transaction and is a deliberate and repeated course of conduct which acts to convert millions of dollars of income provided by unknowing third parties into non-taxable capital contributions.

99.     Engaging in the solicitation and receipt of monies from persons, including SHR, under the guise of a loan without any original intention to ever repay the same is an illegal and fraudulent course of conduct whether committed by one or more persons.

100.     Moreover, intentionally inducing third parties to part with monies as false loans under loan agreements which facially invite manipulation to avoid repayment and thereafter consistently avoiding repayment as a business practice constitutes a scheme to intentionally avoid the federal tax laws.

101.   In the event that PACA acted as the agent or unwitting conduit to enable PPC to obtain the funds loaned by SHR to PACA constitutes fraud or a conspiracy to commit in that PPC or its designee has no intention of ever repaying any such monies.

102.   SHR has been damaged by this course of conduct and inveterate business practice of PPC and demands judgment thereon. The damages suffered are not related to any contractual damages alleged herein related to the Claims Collateral Account or overcharges as stated. The subject damage is independent of and separate of the subject Policies inasmuch as the conduct alleged induces one to separate from funds under completely false pretenses and representations.

WHEREFORE, Plaintiff demands judgment against PPC for all damages allowed by law together with prejudgment interest, attorney's fees and any further relief which this Court may deem just and appropriate.  The Plaintiff demands a trial by jury of all issues triable as of right by jury.

## COUNT VI: VIOLATION FLA. STAT. § 517.301

103.   Additional numbered paragraphs 87-102 are incorporated by reference as if fully stated herein.

104.   The "surplus loans" solicited by PPC and its agents are touted to provide an economic benefit to the lender, including SHR, in the form of obtaining insurance essential to the conduct of business and for the common benefits associated with business loans.

105.   The described practice operates as a fraud and is peppered with knowing and intentional misrepresentations and omissions of material facts upon which the lender relies.

106.   SHR was subjected to the fraud associated with such a transactional loan by PPC or an agent acting on behalf of PPC.

107.    SHR has been injured by such conduct which has been accentuated as the Defendants have jockeyed to cloud the matter of the loan and mislead SHR as to which Defendant has what not unlike the baseball parody of "Who's on First?"

108.    SHR has been damaged by this course of conduct and demands all damages provided by statute.

WHEREFORE, Plaintiff demands judgment against PPC for all damages allowed by law together with prejudgment interest, attorney's fees and any further relief which this Court may deem just and appropriate.  The Plaintiff demands a trial by jury of all issues triable as of right by jury.

## COUNT VII: DECLARATORY JUDGMENT

109.    Pursuant to 28 U.S.C. § 2201, SHR petitions this Court to grant declaratory judgment in favor of SHR as prayed for below and to provide such other equitable and legal relief as is appropriate.

110.    SHR prays for the following adjudications and relief.

111.    Declaration that SHR loaned PACA the amount of $823, 903.20 which is now due and owing by presentment and demand either under the terms of the SLA inasmuch as demand for payment has been made or under the common law in that more than a reasonable amount of time for repayment has passed and such loans are now due for repayment.

112.    In the alternative, declare that PACA at all times material was acting directly on behalf of PPC and that if such loans were forwarded to PPC by said agent that PPC be required to repay such loan amounts or be required to credit any monies it claims due from SHR, penny for penny, in favor of the total loan amount.

113.    Declare that PPC holds monies belonging to SHR in the amount of $628,502.26 as a Collateral Claims Account and enter judgment requiring that PPC either apply such monies as a direct credit against any monies PPC lawfully claims due from SHR, penny for penny, and that any monies not so credited be promptly remitted to SHR.

114.    Declare that the coverage provided by the Policies requires that PPC extend actual coverage and benefit on behalf of SHR in those obligations that exceed the stipulated deductible.

115.    Declare that PPC has no right or authority to demand that SHR place any further monies on Collateral Claims Account inasmuch as PPC has acknowledged the sufficiency of the present sums on account, has acted in such manner as to waive any such claimed right or authority, and is equitably estopped from any such demands based on course of conduct with respect to SHR.

116.    Make such other declarations as may be become necessary and apparent as SHR through discovery uncovers the truth with respect to the matters referenced herein.

### COUNT VIII: VIOLATION OF FLA. STAT. § 626.9541

117.    PPC has misrepresented and overcharged actual premium in excess of that authorized by rate and as set forth in the subject Policies.

118.    SHR has been damaged by such overcharges and seeks all permissible damages allowed by statute and the common law.

WHEREFORE, Plaintiff demands judgment against PPC for all damages allowed by law together with prejudgment interest, attorney's fees and any further relief which this Court may deem just and appropriate.  The Plaintiff demands a trial by jury of all issues triable as of right by jury.

## COUNT IX: BREACH OF LOAN AGREEMENT

119.    PACA has failed to timely repay a loan provided by SHR in accordance with the SLA.

120.    The sum due and owing is from PACA is $823,903.20.

121.    SHR demands judgment against PACA in the amount of $823,903.20.

WHEREFORE, Plaintiff demands judgment against PACA for all damages allowed by law together with prejudgment interest, attorney's fees and any further relief which this Court may deem just and appropriate.  The Plaintiff demands a trial by jury of all issues triable as of right by jury.


Respectfully submitted this 1st day of October, 2008.


/s/ W. Douglas Moody, Jr.
W. Douglas Moody, Jr.
Myers & Fuller, P.A.
2822 Remington Green Circle
Tallahassee, Florida  32308
(850)878-6404 tel.
(850)942-4869 fax

**ATTORNEY FOR PLAINTIFF**