

December 12, 2007

Bill Lindsley
SimpleHR
1077 East Hwy. 98 Suite 200
Destin, FL 32541

Re: Renewal Agreement
Providence Property & Casualty Company
Imperial Casualty and Indemnity Company

Dear Bill,

Please find enclosed the agreement for the 2008-2009 renewal of our workers' compensation insurance policy.

Thank you for your business. We look forward to working with you again and insuring your needs.

Thank you for your time and consideration. Please call me with any questions.

Sincerely,

Derek Lancaster, President

Cc: Jerry Lancaster, Chairman
    Steve Gober, Director of Underwriting



EXHIBIT

F

## AGREEMENT FOR WORKERS' COMPENSATION INSURANCE

This agreement ("Agreement") is entered into by and between Providence Property & Casualty Insurance Company ("Providence") and Imperial Casualty and Indemnity Company ("Imperial") (together, the "Underwriter" "Us" or "We") and SimpleHR your affiliates, assigns, subsidiaries, officers and directors (the "Client" or "You"). This Agreement will become binding on both parties upon (i) You accepting the terms by signing this Agreement, (ii) and Underwriter's acceptance of this Agreement as indicated by signing the Agreement (being the "Binding Trigger") and will constitute a legal agreement. We may be issuing a formal Policy of Workers Compensation Insurance addressing coverage to be underwritten by Us. To the extent there is any inconsistency between the terms or provisions of this Agreement and the Policy, the Policy supersedes the Agreement. The terms and provisions of this Agreement shall survive the issuance or termination of the Policy. Capitalized terms in this Agreement not otherwise defined herein have the meanings ascribed to them in the Glossary attached as Exhibit A.

In entering into this Agreement, Underwriter is relying on information, warranties and representations made by You. Any materially adverse information disclosed or discovered hereafter may, in our sole discretion, cause a new underwriting process to be undertaken, which may result in revisions to the terms of this Agreement and the Policy (including, but not limited to, additional fees, costs and/or limitations there under) and/or termination of this Agreement and the Policy.

**Underwriter:** Providence and Imperial are licensed to underwrite Workers' Compensation insurance in various states. The Workers' Compensation insurance for the Client's activities in a specific Covered State will be underwritten by either Providence or Imperial, depending on which is licensed to do business in such Covered State.

**Policy Numbers:** To be assigned by Us to any Policy issued hereunder.

**Proposed Effective Date of Workers Compensation Policies:**
1/1/2008; provided binding will not occur until the occurrence of the Binding Trigger.

**Proposed Term of Coverage:** 1/1/2008; beginning at 12:01 a.m.; provided binding will not occur until the occurrence of the Binding Trigger. 1/1/2009 the Policy Year End, terminating at 12:01 a.m.

**Deductible:** $500,000 for each and every loss, no aggregate.

**Type of Insurance:** Workers' Compensation and Employer's Liability Insurance

**Covered States:** All states in which We are licensed to write Workers' Compensation insurance provided You submit a request for each state For each

_____ Client Initials                     1 of 16

Covered State, either Providence or Imperial will write the Policy, depending on which underwriter is licensed in such Covered State. No Government Provider States are included within the definition of Covered States.

**Agreement:** This Agreement is valid for ten days from the date of this letter. During such time We have the right to withdraw it in our sole discretion.

**Limits:** Coverage A:
Workers' Compensation Statutory Limits of each Covered State

Coverage B Employers Liability:

| | |
|---|---|
| Each Accident | $ 1,000,000 |
| Disease - Policy Limits | $ 1,000,000 |
| Disease - Per Employee | $ 1,000,000 |
| Foreign Reimbursement | Statutory Limits |
| Repatriation | $ 50,000 |

**Policy Charges:** Premium Charges
Every week, You will pay Us thirty-five percent (35%) of the Manual Premium based on actual payroll data from the previous week (the "Weekly Premium Charge"). The parties agree that the estimated Manual Premium is $2,500,000 and may be adjusted from time to time in connection with Audits and other adjustments undertaken in accordance with the terms of the this Agreement or the Policy.

Audit Charges
We will conduct Audits from time to time, at our discretion, which may result in changes to any of the charges for premiums or payment requirements for collateral set forth herein.

State Assessment Charges
You are responsible for paying "State Assessment Charges," which include assessments charged to Us for second injury funds, guaranty funds, and workers' compensation funds. The State Assessment Charges will be determined from time to time by Us. We will calculate the State Assessment Charges in accordance with our regular practices of pro-rating the assessments charged to Us. The method of prorating will be based on your pro rata share of manual premiums, paid losses or written premium for each relevant State (or any other method used in assessing Us) to correspond with the method or methods used by the relevant State in determining the assessment charged. You will be prospectively charged and must pay based on our estimates of premiums and losses.

_____ Client Initials                    2 of 16

Individual Policy Charges
Arizona, Louisiana, Minnesota, Nevada, and New Jersey require individual policies for Your clients. On a monthly basis, Providence Property & Casualty Insurance Company will bill the expense constants contained in Exhibit D, plus $100 annually per individual policy.

Incurred Losses (See Exhibit A)
You are responsible for paying the Incurred Losses. The Incurred Losses are all those charges we incur as a result of a claim involving your policy of insurance which falls below the deductible, plus the amount we have reserved for it. We will monthly calculate your outstanding Incurred Losses and invoice You via email, with a supporting Loss Run. Our calculation of your Losses will be conclusive and binding, absent manifest error. Any portion of the Loss Deductible Liabilities (including Developed Losses) attributable to unpaid losses shall be subject to, and applied in accordance with the Cash Collateral Terms attached as Exhibit B. Your Losses may continue past the policy term.

Allocated Loss Adjusting Expense (See Exhibit A)
You are required to pay the ALAE as defined in Exhibit A. Included in that amount are expenses associated with the defense and adjustment of the claim. We may, from time to time, utilize vendors at or discretion to handle services associated with claims handling.

Developed Losses (See Exhibit A)
You are also responsible for Developed Losses. Ninety days after the start of the policy term. We will analyze all relevant data in accordance with our actuarial policies and practices as in effect from time to time, to determine Developed Losses for all Losses occurring during the term of coverage (the "Annual Incurred Loss Development"). We will do so by utilizing an actuary of your choice, accredited nationally and approved by Us, to review and determine the Developed Losses. Within 10 days of that report, You agree to pay any amounts owed as a result of the Developed loses upon receipt of the invoice. Developed losses will continue past the policy term.

Collateral
You will maintain satisfactory cash (the "Collateral") on deposit with Us equal to 25% of the Manual Premium as in effect from time to time. Currently, the required amount of the Collateral is $625,000 based on a current estimated Manual Premium of $2,500,000. At present, we hold $0 as collateral. The $625,000 in collateral will be required at binding. We may increase your Collateral requirement above 25% of the estimated Manual Premium at our sole discretion, in which case You are required to make a supplemental Collateral deposit

to the extent necessary to maintain the Collateral at Our required level as set by Our Underwriters. All deposits of Collateral are subject to, and applied in accordance with the Cash Collateral Terms attached as Exhibit B.

Further, every increase of Manual Premium over the Current Estimated Manual Premium Amount will trigger a 25% increase of the additional estimated Manual Premium in the Collateral, which will require You to make an additional Collateral Deposit so your Collateral equals the revised requirement.

The Collateral may be used, at the sole discretion of the Underwriter, for application to any other amounts owed by You under the terms of this Agreement or the Policy. Collateral may be used for Premiums, Claims, Expenses or Fees associated with your policy. It is important to note, any Collateral or money held by US will not be used to fund any premium obligations by You.

Waiver
You hereby waive all rights under Section 9-207 of the Uniform Commercial Code ("UCC"). Specifically, You agree, notwithstanding Section 9-207(c) (2) of the UCC to the contrary, We may retain for our own account any proceeds or interest earned on the Incurred Losses, Developed Losses, and Claims Collateral and such proceeds and interest shall be owned by Us and not applied to the obligations owed by You to Us, nor paid to or otherwise used for your benefit. You further agree We may co-mingle the Claims Collateral, Developed Losses, and any reserved amount of the Incurred Losses with other assets, and hereby waive all rights in contravention of the foregoing.

**Payment Procedures:**

Payment Account
All required payments under this Agreement shall be made to First United Bank and Trust, Routing Number 103100881, for further credit to Account Number 1-930-742, styled Providence Property & Casualty Insurance Company, Operating Account (the "Underwriter Account").

All required payments will be paid via wire transfer to the Underwriter Account, and are due within 10 days from the date of the related invoice unless otherwise specified. Failure to comply with these payment terms may result in one or more of the provisions discussed under "Consequences of Nonpayment".

Premium Payments
The Weekly Premium Charge will be remitted on a weekly basis, no later than the Tuesday following the payroll period ending the preceding Friday. In connection with the Weekly Premium Charge, You will also remit payroll and premium data via email sent to

billing@ppcinsurance.com in the format and layout attached hereto as Exhibit C.

<u>Consequences of Nonpayment</u>

Subject to compliance with applicable law, your failure to pay any amounts owed in the Agreement, when due may, in Our sole discretion, result in a negative underwriting action which may include termination of this Agreement and the Policy.

If a required payment is not received within 10 days of the date of an invoice, You will be charged a late fee equal to one and one-half percent (1.5%) or the Highest Lawful Rate, of the required payment for each subsequent month or any fractional part thereof, until payment is received by Us.

Should you terminate this Agreement early or be in default of any payment or obligation, We reserve the right to immediately accelerate all payments and obligations by You.  Deposits, Collateral and any other moneys placed on deposit with us may not be used to offset amounts owed.  We may retain an experienced and qualified actuary to evaluate Your ultimate liabilities and demand, and You agree to pay, immediately.

<u>General Payment Provisions</u>

To the extent an affiliated entity of yours pays amounts owed to Us by You, We may assume such entity made such payment on your behalf; provided that You will remain primarily liable for all amounts due under this Agreement and the Policy.

Subject to compliance with applicable law, when funds are transmitted for amounts due under this Agreement and the Policy (or any prior agreements or policies with the client), We will apply such funds to your oldest outstanding liability (whether under a current or prior Agreement or policy) first, at the time of such payment for application against a specific liability.

**Initial Payments:**

<u>Collateral Payment</u>:  Total Due: $625,000
$625,000      due at binding

<u>Outstanding Incurred Claim Payment</u>:
$599,319.71 as of 12/10/2007

<u>Terrorism Coverage Payment</u>:
Assessments for the added risk of losses, which may be caused by acts of terrorism, equal to 3.0% per $100 of payroll is estimated to be <u>$ 17,460</u> and collected at binding.

_____ Client Initials          5 of 16

State Assessment Payment:
To be billed monthly.
Exhibit D lists assessments known as of Agreement date.

Expense Constants, Individual Policy Payment:
To be billed monthly. (See page 3.)

**Insurance Certificates:**

We will issue certificates of insurance in connection with all Policies. Subject to compliance with applicable law, such certificates of insurance shall immediately terminate in connection with the termination of the related Policy.

The Underwriting Requirements, attached to this Agreement, made available to and discussed with You are an integral part of this Agreement. Upon acceptance of this Agreement, You will be required to strictly adhere to such Requirements, procedures and guidelines for the term of the Policy. The Underwriting Requirements dictate, among other requirements, that every client company risk: (a) be submitted to Us for individual underwriting and approval; (b) be issued a Certificate of Insurance by Us; and (c) that You report and pay weekly premium charges thereon. Workers' Compensation Insurance Coverage shall not become effective for such client company risk until all three requirements are fully satisfied. Furthermore, failure to comply with any of the Underwriting Requirements will result in the Underwriter having the unilateral right to terminate this Agreement and the Policy and discontinue any and all coverage, subject to compliance with applicable law.

You will provide Us with Your "Client Service Instructions" to assist Us in handling claims associated with Your clients. These instructions are not a part of this Agreement and are not intended to create obligations or requirements on Us. We may, at Our discretion, follow these instructions and utilize Your recommendations. In addition, We may, at Our discretion, retain outside vendors to assist, not to be limited to, Claims Handling, Subrogation or Second Injury Fund Recovery.

You represent and warrant that the transactions contemplated by this Agreement and the performance of your obligations hereunder will not breach any law, contract or other agreement to which You are a party. In carrying out your business and operations, You represent and warrant that You conduct your business in compliance with all applicable laws and contractual obligations to third parties. In connection with, and not in limitation of the foregoing, You agree to indemnify and hold Us, and our respective officers, directors, managers, employees, agents, representatives, controlling persons, stockholders and similarly situated persons, harmless from and pay any and all Damages, directly or indirectly resulting from, relating to, arising out of or attributable to any of the following: (a) any breach of any representation or warranty You made in this Agreement; (b) any breach, violation or default by You of any of obligations in this Agreement or the Policy; and (c) any litigation or threatened litigation, in which We are a party or threatened party, that arises, in whole or in part, from the actual or alleged actions of You.

You agree that until the payments required by the Agreement have been made to Us, including Incurred Losses, Developed Claims, Assessments, etc., You will not without Our written consent arrange with another entity, staff leasing company, or professional employer organization to accept Your current clients as clients of the other entity, staff leasing company, or professional employer organization for the purpose of avoiding the required payments. Until the payments required by the Agreement have been made to Us, You will not close on any transaction to sell a majority of Your assets without providing as a term of the closing that the balance of the remaining unpaid payments owed to Us will be paid to Us as part of and at the time of the closing. This immediate payment obligation to Us shall not be affected, deferred by or made contingent upon any other event under the terms of the transaction.

You agree that until the payments required by the Agreement have been made to Us, Your principal owners, or those Controlling Persons having a majority of the stock in You shall not without Our written consent sell, convey, or transfer more than 50% of their collective ownership; or undertake a transaction such that You are merged, consolidated or reorganized and as a result of such action Your present owners own less than 50% of then-outstanding securities entitled to vote in the election of the directors of You. The signer of this Agreement has personally signed this Agreement to (a) represent that he owns 50% of the outstanding stock and (b) agrees to this restriction on the sale of their stock.

You agree that until the payments required this Agreement have been made to Us, Your directors will not vote to nor approve the liquidation or dissolution of You. If any act or omission by You under this Agreement, including without limitation the payments required by the Agreement or the releases given by You, should for any reason be subsequently declared "fraudulent" or "preferential" within the meaning of any state or federal law relating to creditors' rights ("Voidable Transfers") and, We are required to return or repay any Voidable Transfer or any portion thereof or its counsel advises it to do so, then, as to such Voidable Transfer or the amount returned or repaid (including all of Our reasonable costs, expenses, and attorney's fees related thereto) shall automatically be revived, reinstated and restored and shall exist as though the Voidable Transfer had never been made. In addition, the original liability of You in the full amount of Our rights and remedies in connection therewith shall automatically be revived, reinstated and restored and shall exist as though the Agreement had never been made. You warrant and represent that none of the events set forth above in preceding three paragraphs have occurred as of the date of this Settlement Agreement.

Except to the extent supplemented by the Policy, this Agreement, together with the Exhibits hereto, constitutes the entire agreement and understanding of the parties in respect of the subject matter hereof and supersedes all prior understandings, agreements or representations by or among the parties, written or oral, to the extent they relate in any way to the subject matter hereof, except as may otherwise be required by applicable law. No party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other parties, and any such assignment by a party without prior written approval of the other parties will be deemed invalid and not binding on such other parties. All of the terms, agreements, covenants, representations, warranties and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the

parties and their respective successors and permitted assigns. There are no third party beneficiaries having rights under or with respect to this Agreement. We may, from time to time utilize outside vendors to assist with our duties under this Agreement.

This Agreement is governed by and construed in accordance with laws and the regulations of Oklahoma. The parties agree that any legal action, suit or proceeding relating to this Agreement or the transactions contemplated hereby, shall be instituted in a federal or state court sitting in Oklahoma County, Oklahoma, which shall be the exclusive jurisdiction and venue of said legal proceedings. Any service of process and any other notice in any such action, suit, or proceeding shall be effective against a party when transmitted to Your address, on file with Us. Nothing herein shall be deemed to affect the right of either party to serve process in any manner permitted by laws. This Agreement may not be amended or modified except to the extent any such amendment or modification is allowed by the terms of this Agreement or by a written document signed by all of the parties. This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

Any action brought by Us to recover amounts owed or alleged to be owed by You under this Agreement and if successful, You hereby agree to pay all reasonable attorney fees and expenses by Us for the recovery of the amounts.

No waiver by any party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, may be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising because of any prior or subsequent such occurrence. Neither the failure nor any delay on the part of any party to exercise any right or remedy under this Agreement will operate as a waiver thereof, nor will any single or partial exercise of any right or remedy preclude any other or further exercise of the same or of any other right or remedy.

The provisions of this Agreement are severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of other provisions hereof; provided that if any provision of this Agreement, as applied to any party or to any circumstance, is judicially determined not to be enforceable in accordance with its terms, the parties agree the court judicially making such determination may modify the provision in a manner consistent with its objectives such that it is enforceable, and/or to delete specific words or phrases, and in its modified form, such provision will then be enforceable and enforced.

This Agreement constitutes the entire Agreement between the parties. No oral statements, implied or otherwise constitute an agreement between the parties. Should you terminate this Agreement early or be in default of any payment or obligation, We reserve the right to immediately accelerate all payments and obligations by You.

Attachments
Exhibit A:     Glossary
Exhibit B:     Cash Collateral Terms
Exhibit C:     Payroll and Premium Data Reporting Form
Exhibit D:     State Assessments

_____ Client Initials              8 of 16

**ACKNOWLEDGED AND ACCEPTED:**

I, <u>Bill Lindsley</u>, the _____ of <u>SimpleHR</u>, hereby acknowledge and accept the terms of this Agreement, and have the authority on behalf of <u>SimpleHR</u> to provide such assent as is indicated by my signature below.

**SimpleHR**

By: _____

Its: _____

Date: _____

**COUNTER-ACCEPTED BY UNDERWRITER**

By: <u>Derek Lancaster</u>

Its: <u>President</u>

Date: <u>12/11/07</u>

**Exhibit A**

**Glossary**

"Action" means any action, appeal, petition, plea, charge, complaint, claim, suit, demand, litigation, arbitration, mediation, hearing, inquiry, investigation or similar event, occurrence, or proceeding.

"Allocated Loss Adjusting Expenses" include expenses which are not defined as loss, and are directly related to and directly allocated to the handling of a particular claim. Such expenses include, but are not limited to: 1) independent medical examinations and medical reports or records; 2) court costs and fees for services of process; 3) attorney and hearing representatives 4) court reporter service and transcripts; 5) stenographic services and transcripts; 6) witness fees and expenses; 7) vendor interface charges; 8) bond premiums; 9) printing costs relating to trials and appeals; 10) testimony, opinions, appraisals, reports, surveys, and analyses of professionals and experts; 11) trial and hearing attendants fees; 12) depositions, video statements, private investigators; 13) a charge for savings audit; 14) nurse care management and case management expenses and vocational rehabilitation management charges 15) alternative dispute resolution fees; 16) protection and pursuit of subrogation and recovery rights; 17) Special Investigative Unit fees; and 18) onsite investigation if completed by a vendor. In addition, ALAE shall include charges by General Insurance Managers, a company which is affiliated to Us because of common management, for negotiation of these charges and assisting in reducing ALAE to the file.

"Audit" means the periodic review by the Underwriter of the Client's books and records to determine, among other things, all payroll information has been properly reported, classified, and premiums properly paid.

"Cash Collateral" means the property conveyed by You pursuant to the Agreement.

"Damages" means all damages (including incidental and consequential damages), losses (including any diminution in value), liabilities, payments, amounts paid in settlement, obligations, fines, interests, assessments, penalties, costs of burdens associated with performing injunctive relief, other costs (including reasonable fees and expenses of outside attorneys, accountants and other professional advisors and expert witnesses, and the allocable portion of the Underwriter's internal costs) of investigation, preparation, and litigation in connection with any Action or threatened Action, and other costs and expenses of any kind or nature whatsoever, whether known or unknown, contingent or vested, matured or unmatured, and whether or not resulting from third-party claims.

"Developed Losses" means the Underwriter's actuarial estimate of the amount of the ultimate total cost of all losses occurring during the term of coverage, including Reported Losses, Incurred But Not Reported Losses and Allocated Loss Adjusting Expenses. Such losses are subject to the Deductible amount for each and every claim.

"Government Provider States" means the States of North Dakota, Ohio, Washington, West Virginia and Wyoming.

"Incurred But Not Reported Losses" means losses occurring during the term of coverage which the Underwriter has not been formally notified by the Client, and which have not been recorded in the Underwriter's claims administration system.

"Incurred Losses" means the sum of all payments made by Us plus the reserves established by Us on all Reported Losses.  Incurred losses may increase or decrease periodically throughout the life of the claim.

"Incurred Loss Deductible Liabilities" means the amount of all Incurred Losses.

"Loss Run" means a report showing all Reported Losses and the Incurred Losses for each, occurring during the term of coverage.

"Manual Premium" means the applicable state-determined insurance premium charges (typically expressed as a rate per $100 of payroll) multiplied by the applicable payroll, and before the application of any discounts or credits.

"Policy" means collectively, one or more, insurance policies to be issued, subject to the terms of this Agreement, by the Underwriter as contemplated by this Agreement.

"Reported Losses" means all claims for losses occurring during the term of coverage for which the Underwriter has been formally notified by the Client, and which have been recorded in the Underwriter's claims administration system.

## Exhibit B

### Cash Collateral Terms

As collateral security for the prompt payment in full (whether at stated time for payment, by acceleration or otherwise) of Incurred Losses (including, without limitation, amounts owed for unpaid losses), Developed Losses, Claims Collateral, State Based Assessments, Individual Policy Charges, or any other amounts due under this Agreement (the "Obligations"), You hereby pledge and grant to Us a continuing security interest in all Your rights, title and interest in the Cash Collateral. The balance of the Cash Collateral shall constitute the collateral hereunder and shall not constitute payment of the Obligations until applied as hereinafter provided. We will retain the Cash Collateral until the satisfaction in full of all Obligations; provided, however, at any time following the occurrence and during the continuance of an Event of Default, We may in our discretion apply the Cash Collateral to the payment of the Obligations in the manner specified herein.   In no event will Cash Collateral be used to fund premium obligations.

If any Event of Default shall occur and be continuing, We may by written notice to You, declare the Obligations immediately due and payable without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or any other notice of any kind, all of which are hereby expressly waived; provided, that if the Event of Default is an Event Default described in clauses (iii) or (iv) of the definition of Event of Default, all Obligations shall be immediately due and payable, without presentment, demand, protest, notice of acceleration, notice of intent to accelerate or any other notice of any kind, all of which are hereby expressly waived. During the period during which an Event of Default shall have occurred and be continuing We shall have all of the rights and remedies with respect to the Cash Collateral of a secured party under the UCC as in effect from time to time in Oklahoma and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted.

"Event of Default" shall mean the occurrence or existence of one or more of the following events or conditions (whatever the reason therefore and whether voluntary, involuntary or effected by operation of law):  (i) failure of the Client to pay any Obligations when due (whatever the reason therefore and whether voluntary, involuntary or effected by operation of law); (ii) You cease to be solvent or admit in writing your inability to pay debts as they mature; (iii) a proceeding shall have been instituted in a court having jurisdiction in the premises seeking a decree or order for relief in respect of the Client an involuntary case under any applicable bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect, or for the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator (or similar official) of the Client for any substantial part of its property, or for the winding-up or liquidation of its affairs, and such proceeding shall remain undismissed or unstayed and in effect for a period of sixty (60) consecutive days or such court shall enter a decree or order granting any of the relief sought in such proceeding; or (iv) You commence a voluntary case under any applicable bankruptcy, insolvency, reorganization or other similar law now or hereafter in effect, shall consent to the entry of an

order for relief in an involuntary case under any such law, or shall consent to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator, conservator (or other similar official) of itself or for any substantial part of its property or shall make a general assignment for the benefit of creditors, or shall fail generally to pay its debts as they become due, or shall take any Action in furtherance of any of the foregoing.

<u>Waiver</u>
You hereby waive all rights under Section 9-207 of the Uniform Commercial Code ("UCC"). Specifically, You agree, notwithstanding Section 9-207(c)(2) of the UCC to the contrary, We may retain for our own account any proceeds or interest earned on the Incurred Losses , Developed Losses, and Claims Collateral and such proceeds and interest shall be owned by Us and not applied to the obligations owed by You to Us, nor paid to or otherwise used for your benefit.  You further agree We may co-mingle the Claims Collateral, Developed Losses, and any reserved amount of the Incurred Losses with other assets, and hereby waive all rights in contravention of the foregoing.

## Exhibit C

### Payroll and Premium Data Reporting Form

| Client Name | Client ID | Payroll Ending | Last Name | First Name | SSN | State | Class Code | Current Wages | Excluded Wages | WkS Wages | W/C Rate | W/C Premium | Discount | Discounted Premium (Deductible Premium) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Steve's Brewery, LLC | 200421 | 5/12/2006 | Johnson | Steven | xxxxxxxxx | TX | 8810 | 1200.00 | | 1200.00 | 0.48 | 5.76 | 0.65 | 3.74 |
| Lone Star Trucking, Inc | 200423 | 5/12/2006 | Davis | John | xxxxxxxxx | TX | 7229 | 655.00 | 50.00 | 605.00 | 2.73 | 16.52 | 0.65 | 10.74 |
| Technology One, Inc | 200455 | 5/12/2006 | James | Bryan | xxxxxxxxx | OR | 8871 | 1176.32 | | 1176.32 | 0.98 | 11.53 | 0.65 | 7.49 |

_____ Client Initials

14 of 16

# EXHIBIT D

**State Assessments**

112807

| State | Percentage | Type | Basis of Premium | Estimated Premium | Surcharge |
|---|---|---|---|---|---|
| AL | 1.0000000% | Guaranty Fund | Deductible | | |
| AR | 1.5000000% | Work Comp Fund | Manual | | |
| AR | 0.2000000% | Second Injury Fund | Manual | | |
| AR | 1.3000000% | Death & Perm Disability Fund | Manual | | |
| AZ | 5.5000000% | Work Comp Fund and Special Admin Fund | Deductible | | |
| CO | 3.8180000% | Med. & Injury Fund, State Cash Fund, Prem. Cost Contain Fund | Manual | | |
| DC | 3.2700000% | Premium Surcharge | Deductible | | |
| FL | 0.5000000% | Work Comp Admin Trust Fund | Manual | | |
| FL | 4.5200000% | Special Disability Trust Fund | Deductible | | |
| FL | 2.0000000% | FL WC Guaranty Fund | Manual | | |
| GA | 15.4395390% | Subsequent Injury Fund | Gross Claim Pmts | | |
| GA | 0.8903727% | State Board of WC | Deductible | | |
| GA | 2.0000000% | Insurers Insolvency Pool | Deductible | | |
| HI | 3.0000000% | WC Special Fund | Deductible | | |
| IA | 0.4662695% | Second Injury Fund | Deductible | | |
| ID | 2.5500000% | Special Fund | Gross Claim Pmts | | |
| IL | 1.3125000% | Second Injury Fund | Comp Pmts | | |
| IL | 1.0100000% | Industrial Comm. Ops Fund | Deductible | | |
| IN | 2.5000000% | Second Injury Fund | Comp Pmts | | |
| KS | 3.8600000% | Special Fund | Gross Claim Pmts | | |
| KY | 6.5000000% | Special Fund | Manual | | |
| LA | 1.7100000% | Second Injury Fund W/C | Comp & Med Pmts | | |
| LA | 6.3000000% | Second Injury Fund M&I | Comp & Med Pmts | | |
| MD | 0.0113703939% | WC Commission | Per $ Payroll | | |
| MI | 0.705000% | Second Injury, Silicosis Fund | Manual | | |
| MI | 1.000000% | Guaranty Fund | Manual | | |
| MI | 0.0531001% | Compensation Advisory Org. | Manual | | |
| MI | 0.0602554% | Work Comp Placement Facility | Manual | | |
| MI | 0.9820000% | Labor/Growth Safety Ed Fund | Comp Losses (Exclude Medical) | | |
| MN | 9.2312000% | Second Injury Fund | Manual | | |
| MO | 3.0000000% | Second Injury Fund | Deductible | | |
| MO | 2.0000000% | 2007: 1% W/C Admin. Tax; 1% W/C Surcharge | Deductible | | |

_____ Client Initials

| MS | 1.6500000% | WC Commission | Comp & Med Pmts | | |
|----|------------|---------------|-----------------|---|---|
| MS | 0.0219512% | Insurance Dept. Fund | Deductible | | |
| MT | 1.3800000% | Admin. Fund; Second Injury | Deductible | | |
| NE | 2.0000000% | WC Trust Fund Tax | Gross Claim Pmts | | |
| NJ | 6.3100000% | Second Injury Fund | Manual | | |
| NJ | 1.4000000% | Liability Ins. Guaranty Fund | Deductible | | |
| NM | 1.0000000% | P & C Guaranty Fund | Deductible | | |
| NV | 3.0234219% | Admin., Safety, SIF, Review | Deductible | | |
| OK | 0.7133333% | Multiple Injury Trust Fund | Deductible | | |
| OK | 1.0000000% | Adminstrative Fund | Deductible | | |
| OK | 2.0000000% | Guaranty Fund | Deductible | | |
| OR | 5.5000000% | Adminstrative Fund | Manual | | |
| PA | 3.0900000% | Adminstrative Funds | Gross Claim Pmts | | |
| SC | 13.948800796% | Second Injury Fund | Gross Claim Pmts | | |
| TN | 2.0000000% | Guaranty Fund | Deductible | | |
| TX | 1.1870000% | Maintenance Assessment | Deductible | | |
| UT | 0.0007510% | WC Commission | Deductible | | |
| VA | 1.3600000% | WC Commission | Deductible | | |
| VA | 0.2500000% | Special Fund (Neuro Injury) | Deductible | | |
| VT | 0.4000000% | Adminstrative Fund | Deductible | | |

**Terrorism**
**Charge =**  Total audited WC payroll divided by 100 times 3%
**SimpleHR**
Projected Payroll $58,200,000/ 100 =  $582,000 x 3% = $17,460

**Arizona, Louisiana, Minnesota, Nevada, and New Jersey require individual policies to be issued.**

**Individual policy:**

**$100 per policy, plus expense constants**
**The Expense constants for these policies are as follows:**

**AZ - $180**
**LA - $160**
**MN - $150**
**NV - $200**
**NJ  - $220**

**Expense constants plus the $100 annually per individual policy will be billed on a monthly basis.**

_____ Client Initials                16 of 16